UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Criminal No. 05-10319-RCL

UNITED STATES OF AMERICA

v.

STEPHAN STELMACH
BRYAN MCHUGH

**REPORT AND RECOMMENDATION RE:**
**DEFENDANT STELMACH'S MOTION TO SUPPRESS EVIDENCE**
**ILLEGALLY SEIZED (DOCKET ENTRY # 25); DEFENDANT MCHUGH'S**
**MOTION TO SUPPRESS FRUITS OF A WARRANTLESS SEARCH AND**
**SEIZURE (DOCKET ENTRY # 35); DEFENDANT MCHUGH'S MOTION**
**TO JOIN DEFENDANT STELMACH'S MOTION TO SUPPRESS**
**IDENTIFICATION (DOCKET ENTRY # 34); DEFENDANT**
**STELMACH'S MOTION TO SUPPRESS IDENTIFICATION**
**(DOCKET ENTRY # 28)**

**January 9, 2007**

**BOWLER, U.S.M.J.**

Pending before this court are motions by defendant Stephan
Stelmach ("Stelmach") to suppress evidence illegally seized
(Docket Entry # 25) and to suppress identification (Docket Entry
# 28) and motions by defendant Bryan McHugh ("McHugh") to
suppress fruits of a warrantless search and seizure (Docket Entry
# 35) and to join Stelmach's motion to suppress identification
(Docket Entry # 34).

The above captioned two count Indictment charges Stelmach
and McHugh with:  (1) using force to intimidate or interfere with

a person because of his color and because he was enjoying the goods and services of a public establishment in violation of 18 U.S.C. § 245(b)(2)(F); and (2) aiding and abetting in violation of 18 U.S.C. § 2.

Stelmach moves to suppress a knife and the contents of his wallet that were seized as a result of a purportedly unlawful stop and arrest executed by Ashland police officers on June 3, 2005, in Ashland, Massachusetts.  (Docket Entry # 25).  Stelmach also moves to suppress statements attributed to him (Docket Entry # 25) and identifications made of him on the night in question. (Docket Entry # 28).  McHugh moves to suppress all the items seized from his person and his motorcycle, all the statements he made and all identifications witnesses made of him during the same incident on June 3, 2005, in Ashland.  (Docket Entry # 35).

The following witnesses testified during the evidentiary hearing:  (1) Officer Robert MacQuarrie ("Officer MacQuarrie"), a two year veteran of the Ashland Police Department ("Ashland P.D."); (2) Lieutenant Scott Rohmer ("Lieutenant Rohmer"), a 20 year veteran of the Ashland P.D. who was on duty on the night in question and now serves as the Acting Police Chief; (3) Detective David Muri ("Detective Muri"), a ten year veteran of the Ashland P.D. who was a detective on June 3, 2005; (4) Officer Brian Araujo ("Officer Araujo"), a one year veteran of the Ashland P.D. at the time of the incident who now serves as an officer for the

Milford Police Department; and (5) Jeff Imhoff ("Imhoff"), an employee at T.J.'s Bar and Spirits ("T.J.'s"), a bar and restaurant in Ashland.

Having heard four days of testimony and admitted various items of evidence into the record, this court finds the following facts.

## FACTUAL BACKGROUND

On June 3, 2005, a violent altercation took place at T.J.'s. At about 7 p.m. or shortly thereafter, the dispatcher at the Ashland police station, Bryan Dean ("Dispatcher Dean"), received a 911 call. Officer MacQuarrie was at the station at the time and overheard the caller requesting police assistance at T.J.'s because there had been a fight on the deck involving members of the Outlaw motorcycle gang ("the Outlaws"). Officer MacQuarrie's first thought was to "use caution" because he had received training in Londonderry, New Hampshire, and learned that the Outlaws is an organized crime unit whose members engage in crimes ranging from murder to prostitution. The event in Londonderry, which took place about a week before the incident at T.J.'s, provided local police officers with the opportunity to share information. When Officer MacQuarrie attended the event he learned that the ball peen hammer is one of the Outlaws' preferred weapons and that Outlaw members have also been known to

3

carry knives and firearms.  Officer MacQuarrie left the station in the Ashland P.D.'s marked police cruiser number three and drove west on West Union Street toward T.J.'s.

Officer Araujo, while on the scene of a call on Holmer Avenue less than a mile from the Ashland police station, also heard the 911 call about the incident at T.J.'s and was dispatched to respond.  Like Officer MacQuarrie, Officer Araujo testified that after hearing the reference to the Outlaws on the 911 call he thought about using caution since he had learned during training from fellow officers about the tendency of members of the Outlaws to carry weapons.  Driving marked cruiser number four, Officer Araujo set out for T.J.'s on West Union Street.  Brian Wheeler ("Officer Wheeler"), another Ashland police officer who was on the scene at Holmer Avenue with Officer Araujo, responded to the call from Dispatcher Dean in marked cruiser number five.  Together Officers MacQuarrie, Wheeler and Araujo formed a three cruiser procession traveling toward T.J.'s on West Union Street.  To ensure that the other officers had the same information as he did, Officer MacQuarrie made the following radio transmission:  "Cars four and five be aware . . . Outlaws carry firearms."

About one mile before they reached T.J.'s, Officer MacQuarrie spotted two motorcycles driving east on West Union Street at an estimated speed of 70 miles per hour.  Officer

4

MacQuarrie recognized Stelmach and noticed that the other driver was wearing a leather vest with a logo on the back that "looked consistent with some of the training . . . [he had] on motorcycle gangs."  Officer MacQuarrie thought that the two men were the ones involved in the fight at T.J.'s and were now fleeing from the scene.  Accordingly, he instructed Officer Araujo to turn around and stop them and Officer Wheeler to continue on to T.J.'s to investigate.  With their sirens already activated, Officers MacQuarrie and Araujo reversed their course on West Union Street in pursuit of Stelmach and McHugh.

As the officers followed Stelmach and McHugh on West Union Street, a two lane road with a speed limit of 35 miles per hour, the motorcyclists rode at times on both sides of the double yellow line in the middle of the road, passing some cars in an erratic fashion and forcing others on both sides of the road to pull over.  After approximately a mile and a half the pursuit ended when Stelmach and McHugh stopped their motorcycles near a Shell gas station and parked on the shoulder next to a sidewalk.

Meanwhile, Lieutenant Rohmer was interviewing witnesses and investigating the scene at T.J.'s with Officer Wheeler. Lieutenant Rohmer had not been on duty on the night of June 3, 2005, but after hearing the 911 call at home on his police radio he responded by driving to T.J.'s.  Upon arrival, Lieutenant Rohmer encountered "a lot of commotion," an Ashland ambulance and

two police officers from Hopkinton.  Officer Wheeler was already
conducting witness interviews and, after gathering some
information himself, Lieutenant Rohmer made a radio broadcast
advising his fellow officers that one of the individuals involved
in the fight could be armed with a knife.

Now aware that one of the suspects might have a knife and
knowing that members of the Outlaws are dangerous and that these
two men might have just been involved in a fight, Officer
MacQuarrie decided to handcuff Stelmach and McHugh.  He planned
to handcuff them to protect himself and Officer Araujo and avoid
the inherent dangers of trying to arrest two potentially violent
men with only two police officers.  Officer Araujo also testified
that he intended to place the suspects in handcuffs, knowing that
one of them might be armed with a knife, for the safety of the
officers and of the suspects.

While Stelmach and McHugh were securing their helmets on
their motorcycles, Officer Araujo informed Dispatcher Dean of the
officers' position and then, without their guns drawn, he and
Officer MacQuarrie approached the suspects.  Officer MacQuarrie
instructed the suspects to place their hands in the air where the
officers could see them and to turn around.  The suspects placed
their hands in the air and turned sideways.  As Officer
MacQuarrie approached Stelmach, he asked if he could tell Officer
MacQuarrie what had happened.  Officer MacQuarrie told Stelmach

that he was going to handcuff him for safety and that he could say anything he wanted after that.  It took about 40 seconds for Officer MacQuarrie to handcuff Stelmach and after doing so he conducted a pat frisk of Stelmach to determine if he had any weapons on his person.  Not finding any weapons, Officer MacQuarrie started leading Stelmach to the side of the road.

Officer Araujo was in the process of handcuffing McHugh and had told him he was doing so for the officers' safety.  As McHugh placed his arms behind his back, Officer MacQuarrie noticed a wooden object hanging out of the inside of McHugh's vest.  The object was a ball peen hammer and immediately after Officer MacQuarrie seized it McHugh stated that he was a carpenter. Officer MacQuarrie placed the hammer in the grass on the side of the road.  Officer Araujo then conducted a pat frisk of McHugh to search for weapons and found a pocket knife in one of his pant's pockets which he placed on the grass next to the ball peen hammer.[1]

Officer MacQuarrie informed both Stelmach and McHugh that they were not under arrest.  Once again, Stelmach asked if he could tell his side of the story and Officer MacQuarrie responded by saying, "Go ahead - say anything you like."  Stelmach related that he had gotten into an argument with two females at T.J.'s,

---

[1]  Officers MacQuarrie and Araujo seized both the pocket knife, described as a "lock-back knife," and the ball peen hammer recovered from McHugh during the pat frisk.

called the women "dikes" and told them to "beat it."  A man
Stelmach described as a "hero" had then approached him, butted
chests with him and told him to "back off of the girls."
Stelmach claimed that he told the hero to back off and that he
and McHugh then left the area.

Following this description of the events that took place at
T.J.'s, Stelmach asked Officer MacQuarrie if he would take the
handcuffs off of him.  Officer MacQuarrie told Stelmach he would
have to wait until Officer MacQuarrie got a chance to speak with
an officer at T.J.'s to find out the status of the investigation.
Officer MacQuarrie then radioed Officer Wheeler and inquired as
to what was happening.  Officer Wheeler told Officer MacQuarrie
to hold on to the two suspects because there could be a charge
for assault and battery.  Officer Wheeler also confirmed that the
man with a goatee[2] had been in possession of a ball peen hammer
and that an ambulance was needed for the victim at T.J.'s.

During Officer MacQuarrie's conversation with Stelmach, he
noticed the odor of an alcoholic beverage on Stelmach's breath.
Officer MacQuarrie asked him if he had been drinking and Stelmach
responded that he had had five "White Russians" in four hours.
Stelmach refused to take a field sobriety test and Officer
MacQuarrie told him that he might have to be placed in protective
custody due to his alcohol consumption.  Officer MacQuarrie also

---

[2]  McHugh had a goatee on the night of the incident.

asked McHugh if he had been drinking and McHugh told MacQuarrie that he too had consumed five "White Russians" in four hours and that he would not take a field sobriety test.

Concerned that the suspects might have additional weapons, Officer MacQuarrie then asked Stelmach and McHugh if there was any type of illegal contraband in the motorcycles.  Stelmach responded, "Yeah, you can go ahead and check them.  There's nothing in there."  Officer MacQuarrie concluded that he "had been given consent" to search and Officer Araujo testified that his "understanding was they [Stelmach and McHugh] both gave permission to search."  Officer MacQuarrie attempted to open the saddlebags on Stelmach's motorcycle but could not do so.  After Officer MacQuarrie asked Stelmach for assistance, Stelmach approached the motorcycle and "coached" Officer MacQuarrie on how to open the saddlebags.  Officer MacQuarrie then found clothing, some miscellaneous motorcycle gear and a small knife therein. After he discovered and looked at the knife, he placed it back in the left rear saddlebag of Stelmach's motorcycle.  Meanwhile, Officer Araujo was searching McHugh's motorcycle and both Stelmach and McHugh were cooperating and could see the searches taking place.  Officer Araujo did not find any weapons or illegal contraband in the saddlebags on McHugh's motorcycle but did find items of clothing.

After the officers finished the searches, Stelmach asked

Officer MacQuarrie if he could ride the motorcycles home or have them brought to his house.  Officer MacQuarrie denied the request to ride a motorcycle home but allowed Stelmach to contact a friend via cellular telephone to determine if someone could pick up the motorcycles.  With Stelmach still in handcuffs, Officer MacQuarrie held up the telephone so that Stelmach could ask the friend to come pick up his motorcycle.

While Officers MacQuarrie and Araujo conducted the investigatory stop, Lieutenant Rohmer interviewed two men at T.J.'s.  First, Imhoff informed Lieutenant Rohmer that two Outlaws had harassed a black man who was seated out on the deck with a white woman having dinner.  Imhoff observed that one of the Outlaws had a goatee and they were both white with shaved heads.  Imhoff recounted how the verbal confrontation escalated into a fight, both Outlaws attacked the black patron[3] and one of the Outlaws struck him several times with a hammer.  Imhoff tried to intervene and was punched by one of the Outlaws.  Lieutenant Rohmer also interviewed John Butterfield ("Butterfield"), who observed two white men with shaved heads wearing colors[4] harass two females.  Butterfield intervened and told the Outlaws something to the effect of "knock it off" and the Outlaws responded by threatening to kill Butterfield.

_____

   [3]  This man was taken from T.J.'s to the hospital.

   [4]  "Colors" in this context refers to clothing indicative of a connection to a motorcycle gang.

After conducting the interviews, Lieutenant Rohmer decided to transport Imhoff and Butterfield to the site where Officers MacQuarrie and Araujo had detained Stelmach and McHugh. Lieutenant Rohmer thought that would be the best way to determine if Stelmach and McHugh were the men involved in the incident at T.J.'s.  Lieutenant Rohmer radioed Officer MacQuarrie and asked him to have the officers on the scene turn off their radios so he could speak to him on a secure line.  The officers complied and Lieutenant Rohmer informed Officer MacQuarrie that he was going to drive by with two witnesses in an attempt to identify Stelmach and McHugh.  Lieutenant Rohmer told Imhoff and Butterfield he wanted them to view two individuals who had been stopped a short distance away.  Lieutenant Rohmer told Imhoff and Butterfield that the individuals might or might not be the men involved in the incident at T.J.'s.

In an unmarked cruiser, Lieutenant Rohmer drove the two witnesses to the scene.  Imhoff and Butterfield were sitting in the back seat with Butterfield on the driver's side.  Lieutenant Rohmer could not recall any conversation taking place between the two men during the ride.  Imhoff testified that he and Butterfield spoke about the black man as opposed to who was involved in the fight.  As Lieutenant Rohmer's cruiser approached Stelmach and McHugh, there were approximately six officers on the scene.  Officer Araujo was standing several feet from the

suspects as were two police officers from Holliston and two from Hopkinton.[5]  Officer MacQuarrie was standing apart from the other officers 15 to 20 feet up the road prepared to communicate privately with Lieutenant Rohmer.

As the witnesses approached, Stelmach and McHugh were facing the street with their hands behind them in handcuffs.[6]  Imhoff recognized the men and said, "That's them - that's them for sure."  Butterfield then said he "thought that was them."  After the cruiser passed Stelmach and McHugh, it turned around to afford Butterfield a better look.  As the cruiser passed Stelmach and McHugh for a second time, Butterfield positively identified Stelmach and McHugh stating, "It was them."  When Lieutenant Rohmer asked if Imhoff and Butterfield were certain, both men replied that they were certain and Imhoff identified the shorter man with the goatee (McHugh) as the one with the hammer.[7]

---

[5]  These officers had arrived on the scene for backup shortly after Stelmach and McHugh were handcuffed.  The total number of officers present at the scene vacillated from two to four to three and then gradually up to six.

[6]  At the time, Ashland police cruisers carried cards setting forth identification procedures.  The cards state that "[s]eparating witnesses," which was not done in the case at bar because Imhoff and Butterfield were in the same cruiser, was a "[c]ritical [s]afeguard."  The cards also describe the following procedure with respect to how to present the suspect in a show up identification:  "Standing away from the cruiser, not surrounded by officers at road side so that witnesses cannot see the handcuffs and the same clothing that he had observed."  (Tr. 3-46).

[7]  As indicated _infra_, Lieutenant Rohmer's testimony differs from Imhoff's courtroom testimony.  During the suppression

Lieutenant Rohmer advised Officer MacQuarrie that the witnesses had made a positive identification and instructed him to arrest Stelmach and McHugh for assault and battery with a dangerous weapon.  Officer MacQuarrie estimated that the time from the initial stop of the suspects until the show up identification procedure was between 15 and 20 minutes.

Officer MacQuarrie informed Stelmach and McHugh that they would be arrested for assault and battery with a dangerous weapon and he prepared to conduct a formal search of their motorcycles incident to the arrest.  Detective Muri, however, radioed Lieutenant Rohmer and asked if he could secure the motorcycles back to the Ashland police station because Detective Muri wanted to gather crime related evidence and document all the items belonging to the owners of the motorcycles.  Officer MacQuarrie interpreted Detective Muri's inquiry as an instruction and proceeded to have the motorcycles towed.  Araujo then drove Stelmach and McHugh, respectively, to the Ashland police station.

After Stelmach was placed in a holding cell, Officer Araujo commenced the booking process for McHugh.[8]  Officer Araujo

---

hearing, Imhoff identified the taller man as having the hammer as opposed to the shorter man with the goatee.

[8]  The Ashland Police Report 05-164-AR (Ex. A) indicates that the roadside stop occurred at "19:10" or 7:10 p.m. and that the first computer entry made during booking occurred at "20:06" or 8:06 p.m.  Although the defense spent considerable time trying to establish the length of time between the initial stop and the formal arrest, this court is not persuaded that the process took significantly more time than Officer MacQuarrie's estimate of 15

testified that during the booking process he read McHugh his
<u>Miranda</u> rights, a copy of which was written on a wall nearby.
McHugh did not wish to answer any questions.  Officer Araujo
repeated the process with Stelmach and then Stelmach agreed to
speak with Detective Muri, who had just entered the booking area,
about the incident at T.J.'s.  Detective Muri interviewed
Stelmach in his office for about 30 minutes.  Stelmach, no longer
handcuffed, cooperated by describing his verbal altercation with
the females on the deck at T.J.'s.  Next, Stelmach admitted that
he had fallen to the floor in an altercation with the black
patron at T.J.'s.  While describing this incident, Stelmach
shifted from polite to angry, according to Detective Muri, and
expressed disappointment that he was in custody while the
"moolignon"[9] was free on the streets.

While Officer Araujo conducted the booking procedures,
Officer MacQuarrie performed a search of the motorcycles in the
garage of the Ashland police station.  Officer MacQuarie's
purpose for doing so was to protect the Ashland P.D. and the
company that towed the motorcycles to the station from potential
claims for lost or stolen property and to safeguard the items
that belonged to Stelmach and McHugh.  In addition to these

---

to 20 minutes.  More importantly, as discussed <u>infra</u>, this court
does not consider that the length of this <u>Terry</u> stop was
unreasonable.

[9]  "Moolignon," also spelled "moulignane," is a derogatory
racial slur referring here to the black patron at T.J.'s.

reasons of safeguarding the property and protecting the police from false claims, Detective Muri wanted to inspect the motorcycles "for any weapons and contraband."  (Tr. 2-72 & 86).

Shortly before beginning the inventory searches and in response to an inquiry from Detective Muri, Officer MacQuarrie gave him the knife that he had found in the saddlebag of Stelmach's motorcycle.  As a result, Officer MacQuarrie did not list the knife on the inventory sheet.[10]  Officer MacQuarrie filled out an inventory sheet for each motorcycle and Detective Muri took photographs of the items that were found in the motorcycles.

Meanwhile, Imhoff and Butterfield were transported to the Ashland police station.  Seated in separate rooms, each wrote a statement about the events.[11]

## DISCUSSION

The seven primary issues raised by the motions before this court are:  (1) the propriety of the initial investigatory stop and frisk; (2) the constitutionality of the scope of the Terry stop; (3) whether Stelmach and McHugh consented to a search of

---

[10]  Ashland P.D.'s policy requires the inventorying officer "to write down everything that is found within the vehicle."  An item not reflected on an inventory form could be listed as evidence.  The knife was eventually returned to Stelmach.

[11]  Additional facts, where germane, are set forth in the discussion section.

their motorcycles; (4) the propriety of the inventory search at the Ashland police station; (5) whether the witnesses' identifications are admissible at trial; (6) whether there was probable cause to arrest Stelmach and McHugh; and (7) whether the officers should have advised Stelmach and McHugh of their <u>Miranda</u> rights at some point before they were transferred to the Ashland police station.

I.   <u>The Investigatory Stop and Frisk</u>

        The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. amend. IV.  This right to security is implicated during encounters between police officers and citizens.  Under appropriate circumstances, for the purposes of crime prevention and detection, police officers may approach citizens to investigate "possibly criminal behavior" without probable cause to make an arrest.  <u>Terry v. Ohio</u>, 392 U.S. 1, 22 (1968).  An officer may conduct such a "brief investigatory stop if he has a reasonable, articulable suspicion that criminal activity is afoot."  <u>United States v. Romain</u>, 393 F.3d 63, 71 (1st Cir. 2004), <u>cert.</u> <u>denied</u>, __U.S.__, 125 S.Ct. 2924 (2005).  When a person is "seized" for a <u>Terry</u> stop and officers subject him to a "search," the police conduct "must be tested by the

Fourth Amendment's general proscription against unreasonable searches and seizures."  Id. at 19-20.

Assessing the constitutionality of a Terry stop implicates a dual inquiry of "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference."  Terry v. Ohio, 392 U.S. at 20; accord United States v. Maguire, 359 F.3d 71, 76 (1st Cir. 2004) ("we first determine whether the officers' actions were justified at their inception, and if so whether the actions undertaken by the officers following the stop were reasonably responsive to the circumstances justifying the stop in the first place as augmented by information gleaned by the officers during the stop") (internal brackets, citations and quotation marks omitted); United States v. Chhien, 266 F.3d 1, 6 (1st Cir. 2001) (court considers "whether the officer's actions were justified at their inception, and if so, whether the officer's subsequent actions were fairly responsive to the emerging tableau"); United States v. Young, 105 F.3d 1, 6 (1st Cir. 1997) (same).  The actions of the police must be "reasonable under the circumstances," United States v. McCarthy, 77 F.3d 522, 529 (1st Cir. 1996), and in making this determination the court employs "a wide lens and survey[s] the totality of the circumstances."  Romain, 393 F.3d at 71.

The reasonable suspicion test amounts to an intermediate

standard requiring "more than a naked hunch that a particular person may be engaged in some illicit activity" but less than probable cause "or evidence of a direct connection linking the suspect to the suspected crime." Chhien, 266 F.3d at 6; accord United States v. Cook, 277 F.3d 82, 85 (1st Cir. 2002) (standard requires "more than unfounded speculation but less than probable cause"). Employing a contextual analysis and affording a degree of deference to the expertise of law enforcement officers, Cook, 277 F.3d at 85, "a stop is justified at its inception if the officer can 'point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion.'" Romain, 393 F.3d at 71 (quoting Terry, 392 U.S. at 21, and citing Young, 105 F.3d at 7).

Here, Officers MacQuarrie and Araujo had the requisite reasonable articulable suspicion to detain Stelmach and McHugh, conduct an investigation and determine if they had been involved in criminal activity. First, when police officers observe individuals who fit the description of the perpetrators of a crime that the officers are investigating and the individuals are "in the right place at the right time," these factors support a finding that the officers had a reasonable articulable suspicion that criminal activity was afoot. United States v. Lee, 317 F.3d 26, 31 (1st Cir. 2003). In the present case, Officers MacQuarrie and Araujo were driving toward T.J.'s in response to a 911 call

18

indicating that two members of the Outlaws had been involved in a
fight.  Officer MacQuarrie recognized Stelmach as he sped past
the officers on West Union Street, away from T.J.'s, and noticed
that the other rider, McHugh, was wearing clothing indicative of
membership in a motorcycle gang.  Stelmach and McHugh were thus
"in the right place at the right time" and Officer MacQuarrie was
justified in instructing Officer Araujo to stop them in order to
investigate.  Awareness of gang association is another source of
support for establishing "reasonable suspicion that criminal
conduct has occurred or is occurring."  United States v.
Monteiro, 447 F.3d 39, 47 (1st Cir. 2006); accord United States
v. Feliciano, 45 F.3d 1070, 1074 (7th Cir. 1998) ("knowledge of
gang association . . . is a permissible component of the
articulable suspicion required for a Terry stop").  Officer
MacQuarrie's recognition of the connection between the two
drivers and a motorcycle gang, therefore, also supports his
decision to stop Stelmach and McHugh to investigate.

An individual's "flight from police combined with other
observations by a police officer may [also] support reasonable
suspicion sufficient for detention under Terry."  United States
v. Scott, 270 F.3d 30, 41 (1st Cir. 2001).  On June 3, 2005, when
Officers MacQuarrie and Araujo passed Stelmach and McHugh on West
Union Street, the officers already had their sirens and lights
activated.  After reversing their course, the officers had to

19

pursue Stelmach and McHugh for about a mile and a half before they finally pulled over to the side of the street.  The fact that Stelmach and McHugh appeared to try and flee from the officers further justified the decision by Officers MacQuarrie and Araujo to stop them and supports the existence of reasonable suspicion that Stelmach and McHugh had been involved in criminal activity.

The facts of the present case are analogous to the ones in Maguire, where the First Circuit validated an investigatory stop under Terry.  United States v. Maguire, 359 F.3d 71, 74 (1st Cir. 2004).  In Maguire, a radio dispatcher broadcast information regarding an armed robbery; namely, that the suspects used a knife to commit a robbery and left the scene traveling in a black car towards a Riverside Avenue.  One of the officers who responded to the call followed a black car on Riverside Avenue until the suspects fled on foot.  Id.  Eventually, Maguire was stopped as he walked away from the officers and the First Circuit held that the stop was reasonable at its inception, based in part on the evasive actions of the defendant.  Id. at 76.  The investigatory stop of Stelmach and McHugh was similarly reasonable at its inception due to the evasive, erratic driving of both Stelmach and McHugh that the officers observed.

Once the officers handcuffed Stelmach and McHugh, Officer MacQuarrie conducted a pat frisk of Stelmach and Officer Araujo

did the same with McHugh.  The propriety of a pat frisk search
turns upon whether an officer has reasonable grounds to believe
that a detained individual is armed and dangerous.  Assessed
under "the totality of the circumstances," a pat frisk for
weapons after a <u>Terry</u> stop is "permissible where 'the officer is
justified in believing that the person is armed and dangerous to
the officer or others.'"  <u>United States v. McKoy</u>, 428 F.3d 38, 39
(1st Cir. 2005) (quoting <u>United States v. Schiavo</u>, 29 F.3d 6, 8
(1st Cir. 1994)).  As succinctly stated by the First Circuit in
<u>Romain</u>, "in determining whether a pat-down search is an
appropriate step following a valid <u>Terry</u> stop, the key is
whether, under the circumstances, 'the officer is justified in
believing that the person is armed and dangerous to the officer
or others.'"  <u>Romain</u>, 393 F.3d at 71 (quoting <u>Schiavo</u>, 29 F.3d at
8); <u>accord</u> <u>Terry</u>, 392 U.S. at 27 ("permit[ting] a reasonable
search for weapons for the protection of the police officer,
where he has reason to believe that he is dealing with an armed
and dangerous individual").

Under the circumstances of the present case, a reasonable
officer would be warranted in suspecting that Stelmach and McHugh
were armed and that the officers' safety and/or the safety of
others was in danger.  Officers MacQuarrie and Araujo knew that
two members of the Outlaws had just been involved in a violent
altercation at T.J.'s and they had just learned via a radio

21

transmission from Lieutenant Rohmer that at least one of the men could be armed with a knife.  These facts alone justified Officer MacQuarrie and Araujo's belief that the suspects could be armed and dangerous.  After Officers MacQuarrie and Araujo discovered that McHugh possessed a ball peen hammer, this information provided further support for their decision to pat frisk McHugh and the decision was reasonably responsive to this new information that they gleaned during the investigatory stop. Accordingly, the pocket knife and the ball peen hammer recovered and seized from McHugh during the pat frisk are not subject to suppression on the basis of the allegedly illegal frisk.

II.   The Scope of the Terry Stop

The "ultimate inquiry" regarding the scope of this Terry stop is whether there was "a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." Thompson v. Keohane, 516 U.S. 99, 112 (1995) (internal citations omitted).  To determine "whether this type of restraint existed, a court must examine all the circumstances attendant to the restraint." Maguire, 359 F.3d at 77.  This test is "objective:  the only relevant inquiry is 'how a reasonable man in the suspect's shoes would have understood his situation.'  The subjective beliefs held by the interrogating officers or the person being interrogated are not germane." United States v.

<u>Ventura</u>, 85 F.3d 708, 711 (1st Cir. 1996) (internal citations
omitted).  Relevant circumstances include "whether the suspect
was questioned in familiar or at least neutral surroundings, the
number of law enforcement officers present at the scene, the
degree of physical restraint placed upon the suspect, and the
duration and character of the interrogation."  <u>Id</u>. (internal
citation omitted); <u>United States v. Streifel</u>, 781 F.2d 953, 961
n. 13 (1st Cir. 1986).[12]

To determine whether the scope of a lawful <u>Terry</u> stop has
been exceeded and a detainee is in "custody" for the purposes of
<u>Miranda</u>, therefore, this court must make two discrete inquiries.
<u>United States v. Trueber</u>, 238 F.3d 79, 93 (1st Cir. 2001).
First, this court must make a factual determination of the
circumstances surrounding the incident between the police
officers and the detainees.  <u>Id</u>.  Second, given those
circumstances, this court must determine "whether and when a
reasonable person in [Stelmach and McHugh's] position would have
believed that he was actually in police custody and being
constrained to a degree associated with formal arrest (rather
than simply undergoing a brief period of detention at the scene
while the police sought by means of a moderate number of

_____

[12]  This is not an exhaustive list.  Other courts recognize
additional factors that affect a custody determination, such as
whether there has been "prolonged, coercive, and accusatory
questioning."  <u>Sprosty v. Buchler</u>, 79 F.3d 635, 641 (7th Cir.
1996).

questions to determine his identity and to obtain information confirming or dispelling their suspicions).” Streifel, 781 F.2d at 962.

Most importantly in the present case, Officers MacQuarrie and Araujo told Stelmach and McHugh repeatedly that they were not under arrest.  A reasonable person in that situation likely would conclude that the officers were merely seeking to confirm or dispel their suspicions rather than formally arrest the detainee(s).  In addition, the encounter took place in a neutral setting – on a public street.  See Trueber, 238 F.3d at 94 (encounter on public street suggests detention was a valid investigatory stop and not a de facto arrest).  The underlying character of the detention, therefore, resembled an investigatory stop and not an arrest.  Until Stelmach and McHugh were actually arrested, they were not being constrained to a degree associated with formal arrest.

As for the duration of the investigatory stop, there is no “talismanic time beyond which any stop initially justified on the basis of Terry becomes an unreasonable seizure.” United States v. Quinn, 815 F.2d 153, 157 (1st Cir. 1987) (quoting United States v. Davies, 768 F.2d 893, 901 (7th Cir. 1985)).  According to the Supreme Court, there is no “rigid time limitation on Terry stops;” rather, “common sense and ordinary human experience must govern over rigid criteria.” United States v. Sharpe, 470 U.S.

24

675, 685-686 (1985).  Without rigid criteria, this court must
"examine whether the police diligently pursued a means of
investigation that was likely to confirm or dispel their
suspicions quickly, during which time it was necessary to detain
the defendant."  <u>Id</u>. at 686.  There is no evidence that the
officers in this case were anything but diligent in their attempt
to determine if Stelmach and McHugh were the men involved in the
incident at T.J.'s and this court declines to second guess the
officers' diligence.[13]  The fact that the officers detained
Stelmach and McHugh for approximately 20 minutes was reasonable
under the circumstances, especially since the officers spent a
significant portion of that time awaiting instruction from
Lieutenant Rohmer and the arrival of the witnesses.  <u>See</u> <u>Courson</u>
<u>v. McMillian</u>, 939 F.2d 1479, 1492 (11th Cir. 1991) (detention of
30 minutes ruled not unreasonable where officers awaited
assistance for the majority of the duration of the detention);
<u>United States v. Owens</u>, 167 F.3d 739, 749 (1st Cir. 1999) (50
minute detention was not a <u>de</u> <u>facto</u> arrest where police
diligently pursued a means of investigation that would dispel
their suspicions).

     The number of police officers present and the use of

_____

     [13]  When judging the police officers' diligence, this court
should "take care to consider whether the police [were] acting in
a swiftly developing situation, and in such cases the court
should not indulge in unrealistic second-guessing."  <u>Sharpe</u>, 470
U.S. at 686.

handcuffs are two factors that could support a conclusion that
the scope of the investigatory stop of Stelmach and McHugh was
unreasonable and that they were in custody for the purposes of
Miranda.  Given the other circumstances of this case, however,
these factors do not alter the finding that the scope of this
investigatory stop was reasonable.  First, although there were as
many as six officers on the scene, "[m]ere numbers do not
automatically convert a lawful Terry stop into something
more forbidding."  United States v. Zapata, 18 F.3d 971, 976 (1st
Cir. 1994).  In Lee, the fact that five officers were present on
the scene of a Terry stop did not "inexorably lead to a
conclusion that a de facto arrest occurred."  Lee, 317 F.3d 26,
31 (1st Cir. 2003).  Furthermore, the ratio of officers to
suspects was five to one in Lee whereas, with six officers and
two suspects in the present case, the ratio of officers to
suspects was never more than three to one.  Finally, the
investigatory approach employed by Officers MacQuarrie and Araujo
was measured and they used neither threats nor weapons.  See
Zapata 18 F.3d at 975 (finding that officers' measured approach
supported conclusion that scope of investigatory stop was
reasonable).

As for the officers' decision to restrain Stelmach and
McHugh with handcuffs, this restriction on their freedom of
movement is a factor that influences the reasonableness of the

scope of a <u>Terry</u> stop.  <u>Quinn</u>, 815 F.2d at 157 n. 2.  The use of handcuffs alone, however, "is not sufficient to transform a <u>Terry</u> stop into a <u>de facto</u> arrest."  <u>Id</u>.; <u>accord</u> <u>United States v. Crittendon</u>, 883 F.2d 326, 329 (4th Cir. 1989) ("[b]rief, even if complete, deprivations of a suspect's liberty do not convert a stop and frisk into an arrest so long as the methods of restraint used are reasonable to the circumstances").  When the government seeks to prove that the use of handcuffs did not exceed the limits of a <u>Terry</u> stop, it must be able to point to "some specific fact or circumstance that could have supported a reasonable belief that the use of such restraints was necessary to carry out the legitimate purposes of the stop without exposing law enforcement officers, the public, or the suspect himself to an undue risk of harm."  <u>United States v. Acosta-Colon</u>, 157 F.3d 9, 19 (1st Cir. 1998).  Here the government argues that Officers MacQuarrie and Araujo "reasonably believed that it was necessary to handcuff the defendants for officer safety."  (Docket Entry # 39).  Given the content of the radio transmissions, which suggested that a violent fight had just occurred and that the fleeing participants were likely armed with a knife, the officers were justified in believing it was necessary for their safety to handcuff the suspects.  Where police officers "have information that a suspect is currently armed and that a crime involving violence may soon occur, they are justified in using restraints

such as handcuffs without causing an investigatory stop to cross over into an arrest." <u>Flowers v. Fiore</u>, 359 F.3d 24, 30 (1st Cir. 2004).  Given the circumstances of this incident, Officers MacQuarrie and Araujo had sufficient justification for ensuring their safety by placing Stelmach and McHugh in handcuffs and this decision did not cause the investigatory stop to cross over into a <u>de facto</u> arrest.  The officers reasonably suspected that Stelmach and McHugh had just been involved in a violent altercation and their decision to handcuff Stelmach and McHugh at the outset of the stop was reasonable under those circumstances.

II.  <u>Consent to Search</u>

One of the exceptions to the Fourth Amendment's prohibition against warrantless searches is "a search that is conducted pursuant to consent." <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 219 (1973).  Valid consent must be voluntary, <u>Romain</u>, 393 F.3d at 69, and the "test of voluntariness" is whether consent was "the product of an essentially free and unrestrained choice" or whether one's will was "overborne and his capacity for self-determination critically impaired." <u>Schneckloth</u>, 412 U.S. at 225.  The government "bears the burden of demonstrating that consent was validly obtained." <u>Romain</u>, 393 F.3d at 69.  Whether consent to a search "was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact

28

to be determined from the totality of all the circumstances."
Schneckloth, 412 U.S. at 227.  Some of the factors that affect
the voluntariness of consent are "age, education, experience,
intelligence, and knowledge of the right to withhold consent."
United States v. Barnett, 989 F.2d 546, 555 (1st Cir. 1993).
Other general considerations are whether the "consenting party
was advised of his or her constitutional rights and whether
permission to search was obtained by coercive means or under
inherently coercive circumstances."   Id.

Stelmach asserts that he did not consent to the search of
his motorcycle and thus the knife that Officer MacQuarrie found
in his saddlebag should be suppressed.  (Docket Entry # 25).
Similarly, McHugh asserts that he did not consent to a
warrantless search of his motorcycle.  (Docket Entry # 35).
Conversely, the government contends that the searches of the
saddlebags were valid because Stelmach and McHugh voluntarily
consented to the searches.  (Docket Entry # 39).

Based on the totality of the circumstances, this court finds
that Officers MacQuarrie and Araujo did validly obtain voluntary
consent from Stelmach and McHugh to search their motorcycles.
Officer MacQuarrie testified that after securing Stelmach in
handcuffs, he asked him if there was any type of illegal
contraband in the motorcycles.  Stelmach then responded, "Yeah,
you can go ahead and check them.  There's nothing in there."

McHugh responded in the same fashion as Stelmach.  Next, Officer MacQuarrie attempted to open the saddlebags on Stelmach's motorcycle but had to ask Stelmach for assistance.  Stelmach approached the motorcycle and "coached" Officer MacQuarrie on how to open the saddlebags.  Meanwhile, Officer Araujo was searching McHugh's motorcycle and both Stelmach and McHugh were cooperating and could see the searches taking place.  Officer MacQuarrie concluded that he "had been given consent" and Officer Araujo testified that his "understanding was they [Stelmach and McHugh] both gave permission to search."

Stelmach and McHugh have advanced no specific arguments as to why consent was not validly obtained.  Although Officer MacQuarrie revealed on cross examination that he did not inform Stelmach and McHugh that they had the right to refuse a search of their motorcycles, Stelmach and McHugh have not suggested that any other factor such as their age or intelligence would necessitate a finding that their consent was anything other than voluntary.  The government established that the officers obtained consent without employing coercive tactics inasmuch as Stelmach and McHugh readily agreed to the search, voiced no objection to it and even assisted in its execution.  Furthermore, whether an officer informs a defendant of his right to refuse a search request is not determinative for the issue of voluntariness.  Schneckloth, 412 U.S. at 227 (finding it not improper to rule

that consent was voluntary despite the lack of a police warning
that one could refuse to grant permission for a search).  Under
the totality of the circumstances, therefore, the officers
validly obtained consent that was the product of a free and
unrestrained choice to search Stelmach and McHugh's motorcycles.
The search of the saddlebags was consensual and constitutional.
Hence, on that basis, the pocket knife uncovered in the left rear
saddlebag of Stelmach's motorcycle and the contents of both
Stelmach's and McHugh's saddlebags are not subject to
suppression.


III.  <u>The Inventory Search</u>

        Stelmach and McHugh next maintain that the police did not
properly seize and tow the motorcycles because Officer MacQuarrie
had allowed Stelmach to make an alternate arrangement to avoid a
tow.  They point out that the Ashland P.D.'s inventory policy[14]
provide for this alternate arrangement and that Officer
MacQuarrie only changed his mind as a result of Detective Muri's
instruction to tow the motorcycles.  They further assert that the
"inventory" search at the police station was unconstitutional
because it was an investigatory search for evidence as opposed to
an administrative inventory of the motorcycles' contents.

_____

        [14]  Although a policy "may be unwritten," <u>United States v.
Hawkins</u>, 279 F.3d 83, 86 (1st Cir. 2002), the Ashland P.D. has a
written policy set forth in a six page pamphlet captioned Motor
Vehicle Inventories.  (Ex. 11).

31

Accordingly, Stelmach and McHugh seek to suppress the evidence obtained during the search at the station, including the contents of Stelmach's wallet[15] and the items retrieved from Stelmach's and McHugh's saddlebags.  (Docket Entry # 35, p. 2, ¶ 3; Docket Entry ## 34 & 57).

The government proffers two arguments to justify the search at the Ashland police station.  First, it maintains that the officers had probable cause to search the saddlebags at the scene of the stop.  Under the dictates of <u>Chambers v. Maroney</u>, 399 U.S. 42, 46-52 (1970), the delayed search of the saddlebags at the Ashland police station was therefore constitutional, according to the government.  Second, the government asserts that police may conduct a warrantless inventory search of the contents of a vehicle when it is validly impounded.  Relying on the community caretaking exception, the government submits that the evidence should not be suppressed.  (Docket Entry ## 39 & 59).

The government bears the burden of establishing the lawfulness of the warrantless search at the police station.  <u>United States v. Lopez</u>, 380 F.3d 538, 543 (1st Cir. 2004), <u>cert</u>. <u>denied</u>, 543 U.S. 1074 (2005).  A person usually has an expectation of privacy in a closed container such as an unopened saddlebag.  <u>United States v. Meada</u>, 408 F.3d 14, 23 (1st Cir.

---

[15]  The government's representation that it does not intend to introduce any evidence contained in Stelmach's wallet moots this issue.  (Docket Entry # 39, n. 5).

2005).  Having withdrawn the consent to search the saddlebags at the roadside and objected to the towing of the motorcycles, Stelmach and McHugh had a subjective expectation of privacy in the contents of their motorcycles (Docket Entry # 27, ¶ 9; Docket Entry # 36, ¶ 10) that "'society accepts as objectively reasonable.'"  United States v. Cardona-Sandoval, 6 F.3d 15, 20 (1st Cir. 1993); Katz v. United States, 389 U.S. 347, 361 (Harlan, J., concurring); United States v. Aguirre, 839 F.2d 854, 856-857 (1st Cir. 1988).

The government's first argument requires further briefing. Neither Stelmach nor McHugh directly address the government's first argument.  In essence, the government asserts that because the police had probable cause to search the saddlebags at the roadside, "the later search at the station was also justified" under Chambers.  (Docket Entry # 39, p. 24).  The government does not discuss what, if any, effect the constitutional consent search at the scene has upon the viability of its argument or the suppression of the evidence.  In addition to the foregoing issue, the parties should pinpoint the relevant time from which to evaluate the police officers' collective knowledge and the existence of probable cause to believe that the saddlebags contained contraband or evidence of a crime.  United States v. Goldman, 41 F.3d 785, 787 (1st Cir 1994) (police may search a vehicle without a warrant if they "have probable cause to believe

33

that it contains contraband or evidence of a crime"); <u>United
States v. McCoy</u>, 977 F.2d 706, 710 (1st Cir. 1992) ("only
essential predicate for a valid warrantless search of a motor
vehicle by law enforcement officers is probable cause to believe
that the vehicle contains contraband or other evidence of
criminal activity . . . even in cases where an automobile is not
immediately mobile") (citations, internal brackets and quotation
marks omitted).

The parties are therefore afforded up to and including
January 23, 2007, to address the government's first argument
including the effect, if any, of the consent search conducted and
concluded at the scene.[16]

Turning to the government's second argument, the community
caretaking exception "recognizes that police perform a multitude
of community functions apart from investigating a crime." <u>United
States v. Coccia</u>, 446 F.3d 233, 238 (1st Cir.), <u>cert</u>. <u>denied</u>,
2007 WL 37425 (Jan. 8, 2007) (No. 06-8105).  In performing that
function the police are not investigating a crime or acquiring
evidence to prove that crime.  <u>United States v. Rodriguez-</u>

---

[16]  The parties shall also confer prior to filing the briefs
in an attempt to resolve or narrow the issue.  <u>See</u> LR. 7.1(a)(2)
& 112.1.  The parties should limit the brief to seven pages.
Briefing the foregoing issues does *not* extend to the already
decided issues in this opinion.  The brief is therefore *not*
an opportunity to address or seek reconsideration of issues decided
in this opinion.  Rather, it is strictly limited to the legal
issues identified by this court in this section of the opinion or
otherwise encompassed by the government's first argument.

Morales, 929 F.2d 780, 785 (1st Cir. 1991).  Rather, they are serving the community by aiding "those is distress," combating "actual hazards," preventing future hazards and providing "an infinite variety" of other "services to preserve and protect public safety."  Id. at 784-785; accord Coccia, 446 F.3d at 238 (quoting Rodriquez-Morales, 929 F.2d at 784-785).

"[I]mpoundments of vehicles for community caretaking purposes are consonant with the Fourth Amendment so long as the impoundment decision was reasonable under the circumstances." United States v. Coccia, 446 F.3d at 239.  The reasonableness of the decision to impound under the Fourth Amendment does not turn upon any single factor.  Id. at 238-239.  Adherence to standard procedures, whether contained in state law, city ordinance or police department bulletin, is therefore not the "sine qua non of a reasonable impound decision."  Id. at 239.  On the other hand, an impoundment decision made pursuant to a standardized procedure "will most likely, although not necessarily always, satisfy the Fourth Amendment."  Id. at 238.

Standard impoundment and inventory procedures of the Ashland P.D. dictate that the officer "should" allow an arrested individual to turn over the custody of his vehicle to a third party if the arrested person requests this option and the third party agrees to take charge of the vehicle.  (Ex. 11).  Thus, although an officer has "the initial discretion to decide

whether" or not to tow a vehicle (Tr. 1-81), once the operator is arrested and proposes that the vehicle be turned over to an identified person who agrees to take charge of the vehicle, the officer "should allow such [an] arrangement as an alternative to [a] police tow."[17]  (Ex. 11).

At least with respect to Stelmach's motorcycle, the police did not adhere to this policy in making the decision to tow. Stelmach asked Officer MacQuarrie if he could have the motorcycles brought to his house which was only a short distance from the scene of the arrest.  Officer MacQuarrie allowed Stelmach to make a telephone call and Stelmach proceeded to ask a friend to come pick up Stelmach's motorcycle.  Thereafter and prior to towing, an individual came to the scene prepared to ride the motorcycle away.[18]  By that time, however, Detective Muri

_____

[17]  Officer MacQuarrie testified that the policy also allows for this option when a person is not yet formally arrested.  (Tr. 1-80 & 81).  The policy reads as follows:

> ALTERNATIVE TO TOW:  When the operator is arrested, and proposes that the vehicle be turned over to an identified person who is not under arrest or otherwise incapacitated, and who agrees to take charge of the vehicle, the officer should allow such arrangement as an alternative to police tow.

(Ex. 11).

[18]  The testimony is imprecise as to whether one or two individuals appeared at the scene.  It is also imprecise as to which motorcycle the individual was prepared to ride.
Officer MacQuarrie believed "*an* individual showed up, *one* of the individuals that was going to ride the bikes away, and I think I instructed *them* that they weren't going to be able to

asked Lieutenant Rohmer over the radio "*if* he could secure" the
motorcycles "back to the station for further inspection for any
weapons or contraband."  (Tr. 2-72).  Detective Muri also wanted
to document the items belonging to the owners.  Construing the
inquiry as an instruction, Officer MacQuarrie changed his mind
and had Stelmach's motorcycle towed to the station.[19]  He also
decided to tow McHugh's motorcycle to the station.

   At the police station, Officer MacQuarrie conducted the
search of the motorcycles after handing the pocket knife in
Stelmach's saddlebag to Detective Muri in response to his
inquiry.  Officer MacQuarrie proceeded to complete inventory
forms listing the remaining items found in both motorcycles.
During the search, he recovered "the same gear" as he had seen in
the saddlebags at the roadside.  (Tr. 1-64).

---

ride anymore, but I don't recall *that* transaction."  (Tr. 1-56;
emphasis added).  Given the inability to recall "that
transaction," this court finds that Officer MacQuarrie could not
remember the instruction to "them that they weren't going to be
able to ride anymore."  Accordingly, this court disregards that
clause as opposed to the entire sentence.  Further, inasmuch as
Stelmach made the telephone call "to ask a friend to pick up *his*
motorcycle" (Tr. 1-47; emphasis added), this court finds that one
individual appeared at the scene prepared to ride Stelmach's
motorcycle.

   [19]  Officer MacQuarrie testified that, "Detective Muri
informed me over the radio that he did not want the bikes to be
driven away by other individuals and he wanted them towed to the
Ashland police station."  (Tr. 1-56).  Elsewhere, Officer
MacQuarrie similarly testified that, "Detective Muri got on the
radio and informed me that he wanted them [the motorcycles] towed
back to the police station."  (Tr. 1-58; <u>see</u> <u>also</u> Tr. 1-63).

The fact that the police did not adhere to the police department's standard policy with respect to towing warrants a closer examination of the reasons for the decision to tow the motorcycles.  Detective Muri's stated reasons for having the motorcycles towed back to the station were several.  He wanted both to safeguard the property and protect the Ashland P.D. from false claims of damaged or stolen items.  He also wanted to search for additional weapons and contraband.

The former two reasons amount to "strong governmental interests" but they typically apply to inventory or caretaking procedures once the vehicle is in police custody.  See Colorado v. Bertine, 479 U.S. 367, 372 (1987) (inventory procedures "serve to protect an owner's property while it is in the custody of the police" as well as "insure against claims of lost, stolen, or vandalized property").  The First Circuit in Coccia, 446 F.3d at 238, and United States v. Rodriguez-Morales, 929 F.2d at 787 n. 3, however, distinguishes between the reasonableness of the initial decision to impound and the reasonableness of the inventory search.  See also United States v. Goodrich, 183 F.Supp.2d 135, 139 (quoting United States v. Duguay, 93 F.3d 346, 351 (7th Cir. 1996), that the decision to impound "'is properly analyzed as distinct from the decision to inventory'").  Coccia, Rodriguez-Morales and this case involve the reasonableness of the decision to tow and impound.

Nonetheless, Detective Muri's investigatory reason does not necessarily invalidate the decision to impound or tow as long as it was not the "sole purpose" for the decision.  See Coccia, 446 F.3d at 241.  Detective Muri's desire to further investigate the crime may coexist with other caretaking reasons as long as the impoundment decision "'is not a mere subterfuge for investigation.'"  Id. (quoting Rodriguez-Morales, 929 F.2d at 787).

Frequently cited caretaking reasons which justify a decision to impound include:  removing a vehicle "that might otherwise be left abandoned," United States v. Ramos-Morales, 981 F.2d 625, 627 (1st Cir. 1992) (further explaining that abandoned car faced significant risk of being stolen or damaged); removing a vehicle that impedes "traffic or threaten[s] public safety and convenience," Coccia, 446 F.3d at 238; removing a vehicle located on a highway where there is no driver available with a valid license, Rodriguez-Morales, 929 F.2d at 786 (paraphrasing United States v. Velarde, 903 F.2d 1163, 1166-1167 (7th Cir. 1990)); removing a vehicle from a public street or private parking lot to protect it against theft and vandalism, United States v. Ramos-Morales, 981 F.2d at 626 (collecting cases); removing a vehicle from a parking lot partly used for business where "no known sober person was available to take custody," Id. (paraphrasing United States v. Brown, 787 F.2d 929, 932 (4th Cir. 1986)); and removing

a vehicle that might contain dangerous weapons and thereby threaten public safety, <u>Coccia</u>, 446 F.3d at 240.

Examining Detective Muri's stated reasons for the tow against this backdrop reveals their weaknesses. In addition, protecting an owner's property from theft becomes less convincing where, as here, Stelmach wanted the individual to take custody of the motorcycle and the individual was ready and available to perform that responsibility. Taking the motorcycle into police custody also enhances as opposed to diminishes the chances of a false claim against the police for damages or stolen property given the extended period of police custody. Notably, Detective Muri's reasons justify the reasonableness of the inventory searches as opposed to the separate decision to tow and impound.[20] Furthermore, the reasonableness of the decision becomes all the more questionable because of the presence of an individual who could have driven Stelmach's motorcycle from the

---

[20] The strong and legitimate non-investigatory reasons for the inventory searches, i.e., safeguarding Stelmach's and McHugh's property and protecting the police from false claims, justify the reasonableness of the inventory searches, <u>see</u> <u>Colorado v. Bertine</u>, 479 U.S. at 372-373, albeit not the reasonableness of the decision to impound Stelmach's motorcycle. In addition, even assuming arguendo that Officer MacQuarrie did not conduct the inventory in accordance with Ashland P.D.'s standard policies set forth in footnote ten, he did not act "in bad faith or for the sole purpose of" investigating the crime with respect to conducting the inventories themselves. <u>See</u> <u>Id</u>. at 372-373. The inventory searches of both motorcycles, as opposed to the initial decision to impound Stelmach's motorcycle, satisfy the Fourth Amendment.

scene.[21]

As previously noted, the determinative inquiry in deciding the constitutionality of an impoundment decision undertaken for community caretaking purposes is whether the decision was "reasonable under the circumstances."  Coccia, 446 F.3d at 241; Rodriquez-Morales, 929 F.2d at 785 ("imperatives of the [F]ourth [A]mendment are satisfied in connection with the performance of such noninvestigatory duties, including community caretaker tasks, so long as the procedure employed (and its implementation) is reasonable").  The police are also not required to choose the course that is "the least intrusive means" to the arrested individual, Rodriquez-Morales, 929 F.2d at 786, "so long as the option chosen is within the universe of reasonable choices."  Coccia, 446 F.3d at 239.  "[E]xamining all the facts and circumstances," assessing reasonableness involves balancing "the competing interests."  Rodriquez-Morales, 929 F.2d at 785-786.

Here, under the facts and reasonable inferences found by this court, there was a person immediately on hand to take possession of Stelmach's motorcycle.  The individual's presence eviscerates any non-investigatory reasons to tow Stelmach's

---

[21]  Law enforcement officials are not required to provide a person with the opportunity to make substitute arrangements. Coccia, 446 F.3d at 240 n. 7.  In the case at bar, however, Stelmach asked for such an arrangement.  Officer MacQuarrie allowed him to make the arrangement and the individual was available to take custody of Stelmach's motorcycle prior to the towing.

41

motorcycle to avoid theft.  Cf. Vega-Encarnacion v. Babilonia, 344 F.3d 37, 41 (1st Cir. 2003).[22]  It also eliminates any non-investigatory caretaking reason based upon the motorcycle's obstruction of traffic or its being illegally parked.  There was no showing that the individual who appeared at the scene was not sober.  Finally, there was no showing that the motorcycle contained explosive material.  Cf. Coccia, 446 F.3d at 240 (noting risk to public safety of leaving a vehicle that "might contain items . . . such as explosive material, chemicals or biological agents").[23]

Indeed, the individual presented an obvious and eminently reasonable alternative means to impounding Stelmach's motorcycle.

---

[22]  The First Circuit decision in Vega is instructive for what the decision says as well as for what it does not say.  The First Circuit in Vega vacated the lower court's allowance of a motion to dismiss a civil rights action challenging the constitutionality of a decision by two deputy marshals to impound Vega's vehicle.  The facts in the complaint, viewed in Vega's favor, described the impoundment as made *after* the marshals allowed Vega to make a telephone call to his brother to arrange for him to retrieve the vehicle.  When the brother arrived at the scene, the vehicle had already been towed to a secure lot.  The First Circuit found it was necessary to remand the case to the lower court to address the "somewhat unusual" and inadequately briefed legal issue of the constitutionality of the decision to seize the vehicle.  The case at bar involves facts even more favorable to a defendant because the individual appeared before the tow and the relevant policy dictates that, in such circumstances, the officer should allow this third party arrangement.

[23]  It is true that members of the Outlaw gang have a known propensity to carry weapons such as knives, firearms and ball peen hammers.  There was no testimony, however, that this propensity extended to biological or chemical weapons.

Cf. Coccia, 446 F.3d at 240 (noting, as means to further justify
the impoundment decision, that "there was no obvious alternative
means for removing the car other than impoundment").  Examining
all the facts and circumstances, this court concludes that the
decision to tow Stelmach's motorcycle was not reasonable and
therefore contravened the Fourth Amendment.  Although the
decision to impound is discretionary and arises under varied and
unexpected circumstances, Coccia, 446 F.3d at 239; Rodriguez-
Morales, 929 F.2d at 787, the reasonableness of the decision to
tow, as distinguished from the later reasonableness of the
inventory, was not based upon a reasonable community caretaking
concern.  See Coccia, 446 F.3d at 239 (decision to impound
requires that it "be based, at least in part, on a reasonable
caretaking concern and not exclusively on 'the suspicion of
criminal activity'").  There was no solid, non-investigatory
reason for towing the motorcycle.  Rather, there were only the
investigatory reasons for the decision, i.e., searching for
contraband and acquiring additional evidence relating to the
crime.  Accordingly, the government's second argument does not
provide a basis to justify the warrantless search of Stelmach's
saddlebag at the Ashland police station.

The decision to tow McHugh's motorcycle, however, was
justified because there was no person on the scene agreeing to
take custody of McHugh's motorcycle.  The police therefore

43

complied with the relevant policy.[24]   In addition, where, as
here, "a driver is arrested and there is no one *immediately* on
hand to take possession, the officials have a legitimate non-
investigatory reason for impounding the car."   Vega-Encarnacion
v. Babilonia, 344 F.3d at 41.   Leaving McHugh's motorcycle at the
side of the road posed a risk of vandalism, see Ramos-Morales,
981 F.2d at 626-27, and more than likely a greater risk to
traffic safety.   The valid impoundment and the inventory search
of the contents of McHugh's saddlebag at the Ashland police
station therefore does not provide a basis to suppress the items
found therein.

Concluding that the search of Stelmach's saddlebag at the
Ashland police station was not a valid inventory search leaves
the unanswered question of the application of the exclusionary
rule.   Again, beyond conclusory statements, neither Stelmach nor
the government adequately brief the issue.   This court therefore
reserves a ruling on the application of the exclusionary rule to
the contents of Stelmach's saddlebag based upon the invalid
inventory search.   The parties may address this issue in their
forthcoming briefs.[25]

---

[24]   See footnote 17.

[25]   Having made a ruling on the reasonableness of the
impoundment decisions as to Stelmach and McHugh and the validity
of the searches at the Ashland police station as inventory
searches (as opposed to searches under the parameters of
Chambers), the parties should *not* address those issues in the

V.   The Show-Up Identifications

Stelmach filed a motion to suppress the identifications that Imhoff and Butterfield made during the show up identification procedure on June 3, 2005.  (Docket Entry # 28).  McHugh filed a motion to join Stelmach's motion to suppress the identification. (Docket Entry # 34).  Since the government does not oppose McHugh's motion (Docket Entry # 38), McHugh's motion to join Stelmach's motion to suppress the identification is allowed.

Stelmach and McHugh argue that the identification procedure was impermissibly suggestive and that the witnesses made unreliable identifications.  (Docket Entry ## 29, 35 & 58).  The government contends that the procedure was not impermissibly suggestive and that the identifications were reliable.  (Docket Entry # 38).

This court must conduct a two pronged inquiry to determine if the results of a pretrial identification procedure should be excluded from trial.  United States v. de Jesus-Rios, 990 F.2d 672, 677 (1st Cir. 1993).  First, this court determines whether the procedure was "impermissibly suggestive." Id.  Second, if this court determines that the procedure was "impermissibly suggestive, it must then inquire whether, under the totality of circumstances, the identification itself was reliable." Id.  The

_____

briefs.

45

court considers the following five factors under the reliability

prong:

> (1) the opportunity of the witness to view the criminal at
> the time of the crime; (2) the witness' degree of attention;
> (3) the accuracy of the witness' prior description of the
> criminal; (4) the level of certainty demonstrated by the
> witness at the confrontation; and (5) the length of time
> between the crime and the confrontation.

Id. Overall, in order to suppress identification evidence, this

court must be persuaded that "there was a very substantial

likelihood of irreparable misidentification" and "only in

extraordinary circumstances should identification evidence be

withheld from the jury." United States v. Watson, 76 F.3d 4, 6

(1st Cir. 1996).

Although the identification procedures employed by the

officers were somewhat suggestive and the witnesses were not

separated,[26] they were not impermissibly suggestive.  The

identifications also satisfy the reliability prong of the inquiry

and the circumstances attendant to the identifications do not

warrant suppression of the identification evidence.

Show up identification procedures contain an "inherent

element of suggestiveness," but ones that take place "immediately

after the offense has been committed may be necessary in order to

avoid the mistaken apprehension of the wrong person." Watson, 76

F.3d at 6-7.  Additionally, when an officer has doubts or "should

have doubts whether a detained suspect is in fact the person

---

[26]  See footnote six.

46

sought, the officer must make immediate reasonable efforts to confirm the suspect's identity." United States v. Bautista, 23 F.3d 726, 730 (2nd Cir. 1994) (internal citations and quotations omitted).  The show up identification procedure that Lieutenant Rohmer conducted took place within minutes of the incident at T.J.'s.  It also allowed the officers to confirm their suspicions about Stelmach and McHugh's involvement in that incident.  The First Circuit in Watson held that a procedure of bringing a witness and a suspect together shortly after an altercation where the witness had an opportunity to deny recognizing the suspect was not impermissibly suggestive.  Watson, 76 F.3d at 7.  Similarly, Lieutenant Rohmer's show up identification procedure was conducted in close temporal proximity to the incident at T.J.'s and before bringing the witnesses to the scene of the Terry stop Lieutenant Rohmer informed them that the suspects who they were about to see may or may not have been involved in the incident at T.J.'s.  The efficiency and the mode of Lieutenant Rohmer's show up identification procedure constituted a reasonable effort to confirm or dispel the officers' suspicions about Stelmach and McHugh's participation in the altercation at T.J.'s.

Stelmach and McHugh also argue that the identification procedure was tainted because he and McHugh were handcuffed and standing among several police officers.  Under similar

circumstances the First Circuit held that an identification
procedure wherein a witness viewed a suspect handcuffed and
sitting in a police cruiser before positively identifying the
suspect was not impermissibly suggestive.  United States v.
Lebron-Cepeda, 324 F.3d 52, 59 (1st Cir. 2003).  The facts in
Lebron-Cepeda are more supportive of a finding of impermissible
suggestiveness than the facts of the present case.  Here,
although Stelmach and McHugh were handcuffed during the show up
identification procedure, there is no indication that the
witnesses were aware of the handcuffs because the suspects were
standing with their hands behind their backs while facing the
street.  In addition, the suspect in Lebron-Cepeda was already in
a police cruiser when the witness identified him, a setting even
more suggestive of wrongdoing than one in which the suspects are
standing on the side of the road, untouched by any officers and
unencumbered by the confines of a police cruiser.  Stelmach and
McHugh were identified in a show up procedure that was somewhat
suggestive but as a whole Lieutenant Rohmer handled the situation
in a reasonable fashion and did not create a situation that was
impermissibly suggestive.

In light of the finding that the show up identification
procedure in this case was not impermissibly suggestive, this
court need not address the reliability prong.  To be thorough,
though, this court notes that the witnesses viewed the suspects

at T.J.'s under heightened awareness, given that one of the
Outlaws punched Imhoff and that they both verbally attacked
Butterfield.

Imhoff, the only busboy assigned to the bar and terrace,
where all 12 to 14 tables were full, first heard a loud noise or
the words "leave me alone" and then witnessed one of the men yank
the black man out of his chair by his arm.  Imhoff was
approximately 20 feet away at the time and a fair number of
people were standing in the area.  Imhoff then dropped the plate
he was holding and ran over to assist.  When he was within a
couple of feet, he had the opportunity to observe one of the men
land blows on the black man who was trying to stand up on his
hands and knees.  Although Imhoff's written statement identifies
the man with the goatee as taking out the hammer and hitting the
back man on the back, he testified at the suppression hearing
that the taller man without the goatee was hitting the black man
with the hammer.  When Imhoff saw the hammer, he backed away but
also assisted in dragging the black man away from the two men.
Although the altercation lasted only two to three minutes with
the suspects leaving thereafter, Imhoff had sufficient
opportunity to view both Stelmach and McHugh with heightened
awareness and attention.

In addition, both Imhoff and Butterfield claimed to be
certain of the identifications they made driving by the suspects

on the side of the road and only a short time elapsed between the incident at T.J.'s and the show up identification procedure. Under the totality of these circumstances, the identifications that Imhoff and Butterfield made of Stelmach and McHugh easily satisfy the requirements of the reliability prong.  In sum, there is little, if any, likelihood of a misidentification in this case.  Accordingly, this court declines to suppress the identifications that the witnesses made with respect to Stelmach and McHugh.

VI.  <u>Probable Cause</u>

     Officers MacQuarrie and Araujo executed a warrantless arrest of Stelmach and McHugh.  Stelmach argues that the police did not have probable cause to do so (Docket Entry ## 26 & 57), whereas the government contends that the information the officers gathered from the events leading up to and including the investigatory stop provided sufficient probable cause to execute a lawful warrantless arrest.  (Docket Entry # 39).  In the context of warrantless arrests, "[p]robable cause must be evaluated in light of the totality of circumstances."  <u>United States v. Uricoechea-Casallas</u>, 946 F.2d 162, 165 (1st Cir. 1991). Probable cause requires "reasonably trustworthy information such as would lead a prudent person to believe that the suspect likely had committed or was committing a criminal offense."  <u>Lee</u>, 317

50

F.2d at 32.   Probable cause does not demand, however, "the same
quantum of proof or the same degree of certitude as a
conviction."   Id.

In light of the totality of the circumstances of this case,
the Ashland police officers had probable cause to arrest Stelmach
and McHugh.   The officers had reasonably trustworthy information
that a violent fight had taken place at T.J.'s involving men on
motorcycles with an apparent affiliation to the Outlaws.   Once
Officers MacQuarrie and Araujo observed two men wearing clothing
indicative of a motorcycle gang affiliation, speeding away from
the direction of T.J.'s and leading the officers on a high speed
chase, they had reasonable suspicion to investigate for further
evidence corroborative of criminal activity.   After discovering
the knife and the ball peen hammer possessed by Stelmach and
McHugh, respectively, Officers MacQuarrie and Araujo did not yet
have definitive proof of wrongdoing.   When Imhoff and Butterfield
positively identified Stelmach and McHugh, though, Lieutenant
Rohmer was justified in believing that the suspects likely had
committed the criminal offense, assault and battery with a
dangerous weapon, that he had been investigating.   Lieutenant
Rohmer was thus justified in instructing Officer MacQuarrie that
there was probable cause to arrest Stelmach and McHugh.
Accordingly, this court declines to suppress the fruits of the
arrest on the basis of a lack of probable cause to make the

arrests.


VII.  <u>Miranda</u>

Stelmach urges this court to suppress the statements he made on the night of June 3, 2005 (Docket Entry # 25) as does McHugh (Docket Entry # 35).  According to the government, all of the statements that Stelmach and McHugh made both at the scene and at the Ashland police station should not be suppressed.  (Docket Entry #39).  This court agrees with the government.

The government may not use statements "stemming from custodial interrogation of [a] defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."  <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966).  The procedural safeguards to be employed include warnings to a defendant that he "has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney."  <u>Id</u>.  These <u>Miranda</u> warnings "are not required when the suspect is not in custody" and ordinarily during <u>Terry</u> stops suspects are not in custody for the purposes of <u>Miranda</u>.  <u>See</u> <u>Quinn</u>, 815 F.2d at 160.  The target of a <u>Terry</u> stop must be advised of his <u>Miranda</u> rights only if and when he is "subjected to restraints comparable to those associated with a formal arrest."  <u>Berkemer</u>, 468 U.S. at 441.

Turning to statements made at the scene, as discussed <u>supra</u>, because a reasonable person in Stelmach and McHugh's situation would not consider himself under arrest, Stelmach and McHugh were not in a custodial situation requiring <u>Miranda</u> warnings. Instead, a reasonable person would have believed that he was simply "undergoing a brief period of detention at the scene while the police sought by means of a moderate number of questions . . . to obtain information confirming or dispelling their suspicions." <u>Streifel</u>, 781 F.2d at 962.  All of Stelmach and McHugh's statements made at the scene prior to the arrest are therefore admissible because Stelmach and McHugh were not subjected to custodial interrogation.

Stelmach also made statements at the Ashland police station after a waiver of his <u>Miranda</u> rights which are admissible. Although "verbal evidence" that is the fruit of an illegal arrest must be suppressed, <u>Wong Sun v. United States</u>, 371 U.S. 471, 484-486 (1963), the arrest of Stelmach was supported by probable cause.  Stelmach's arrest was therefore lawful and the statements he made at the Ashland police station are admissible since they are not the fruits of an illegal arrest.

<u>CONCLUSION</u>

In accordance with the foregoing discussion, this court

**RECOMMENDS**[27] that Stelmach's motion to suppress evidence illegally seized (Docket Entry # 25) and McHugh's motion to suppress the fruits of a warrantless search and seizure (Docket Entry # 35) be **DENIED**, subject to reserving the issue of the constitutionality of the search of Stelmach's motorcycle at the Ashland police station under Chambers (the government's first argument) and the application of the exclusionary rule to the contents of Stelmach's saddlebags at the Ashland police station. This court reserves a recommendation on these issues pending further briefing.  In accordance with the parameters of this opinion,[28] the parties are allowed up to and including January 23, 2007, to file a brief limited to the issues set forth in the body of this opinion.  This court further **RECOMMENDS**[29] that McHugh's motion to join Stelmach's motion to suppress identification (Docket Entry # 34) be **ALLOWED** and Stelmach's motion to suppress identification (Docket Entry # 28) be **DENIED**.

---

[27] Any objections to this Report and Recommendation must be filed with the Clerk of Court within ten days of receipt of the Report and Recommendation to which objection is made and the basis for such objection.  Any party may respond to another party's objections within ten days after service of the objections.  Failure to file objections within the specified time waives the right to appeal the order.  United States v. Escoboza Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986).

[28] See notes 16 and 25 supra.

[29] See the previous footnote.

54

    /s/   Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge